**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

VALLEY MEAT COMPANY, LLC,

        Plaintiff,

v.

TOM VILSACK, Secretary,
U.S. Department of Agriculture

        Defendant,

AL ALMANZA, Administrator,
Food Safety and Inspection Service

        Defendant.

Case No.  2:12-cv-01083-JCH-CG

Judge Judith C. Herrera

Magistrate Judge Carmen E. Garza

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE BY FRONT RANGE
EQUINE RESCUE AND THE HUMANE SOCIETY OF THE UNITED STATES**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     PROCEDURAL AND FACTUAL BACKGROUND ..................................................... 1

III.    LEGAL STANDARD ......................................................................................... 5

IV.    ARGUMENT ................................................................................................... 6

       A.      FRER AND HSUS SHOULD BE PERMITTED TO INTERVENE AS OF
             RIGHT ................................................................................................. 6

             1.      This Motion is Timely ............................................................... 6

             2.      Proposed Intervenors Have Significant Interests at Stake ........................ 7

                    a.      Proposed Intervenors' Pending Rulemaking Petitions ................. 7

                    b.      HSUS Has an Interest in its Favorable Judgment .......................... 8

                    c.      Proposed Intervenors Have a Legal Interest, Rooted in
                            Their Petitions and Expenditure of Significant
                            Organizational Resources, in the Issues in This Case .................... 9

             3.      Disposition Of This Action As A Practical Matter May Impair Or
                  Impede Proposed Intervenors' Ability To Protect Their Interests .......... 11

             4.      Absence of Adequate Representation ......................................... 13

       B.      ALTERNATIVELY, THE COURT SHOULD GRANT PROPOSED
             INTERVENORS LEAVE TO PERMISSIVELY INTERVENE ....................... 14

             1.      Common question of fact or law ............................................... 15

              2.      Absence of Prejudice ............................................................... 15

V.     CONCLUSION ............................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Bowers v. Mortgage Elec. Registration Sys.*,
  CIV.A. 10-4141-JTM, 2011 WL 3349297 (D. Kan. Aug. 3, 2011) ........................................ 11

*C.V. v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ................................................... 4

*Cavel Int'l., Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ................................................... 4

*Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Dep't of Interior*,
  100 F.3d 837 (10th Cir. 1996) ............................................ passim

*DeJulius v. New Eng. Health Care Emps. Pension Fund*,
  429 F.3d 935 (10th Cir. 2005) ................................................... 15

*Elliot Indus., Ltd. P'ship. v. Am. Prod. Co.*,
  407 F.3d 1091 (10th Cir. 2005) ................................................... 5

*Forest Guardians v. U.S. Dep't. of Interior*,
  2004 WL 3426413 (D.N.M. Jan. 12, 2004) ........................................ 6, 7

*Humane Society of the United States v. Johanns*,
  520 F. Supp. 2d 8 (D.D.C. 2007) ............................................ passim

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................... 9

*S2 Automation LLC v. Micron Tech., Inc.*,
  CIV 11-0884 JB/WDS, 2012 WL 3656462 (D.N.M. Aug. 14, 2012) ........................ 5, 6, 7, 11

*San Juan Cnty., Utah v. United States*,
  503 F.3d 1199 (10th Cir. 2007) ................................................... 9, 12

*Utah Ass'n of Counties v. Clinton*,
  255 F.3d 1246 (10th Cir. 2001) ................................................... 6, 7, 11

*Utahns for Better Transp. v. U.S. Dept. of Transp.*,
  295 F.3d 1111 (10th Cir. 2002) ................................................... 13

*WildEarth Guardians v. Nat'l Park Serv.*,
  604 F.3d 1192 (10th Cir. 2010) ........................................ 7, 11, 13

*WildEarth Guardians v. U.S. Forest Service*,
  573 F.3d 992 (10th Cir. 2009) ................................................... 11

**STATUTES**

5 U.S.C. §706, *et seq* ................................................................................................ 4
42 U.S.C. § 4321 *et seq*.......................................................................................... 2, 3

**RULES AND REGULATIONS**

9 C.F.R. § 301.2(2)(iii) ............................................................................................. 3
9 C.F.R. § 318.20................................................................................................... 3
Fed. R. Civ. P. 24 ........................................................................................... *passim*

## I.  INTRODUCTION

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Front Range Equine Rescue ("FRER") and The Humane Society of the United States ("HSUS") (collectively "Proposed Intervenors") seek to intervene in the above-captioned action.  Proposed Intervenors' interests, which could be impaired by the outcome of this litigation, in combination with the absence of adequate representation by the current defendants, provide solid grounds for them to intervene as of right.  Alternatively, the Court should permit the Proposed Intervenors to permissively intervene because pending claims and legal rights held by Proposed Intervenors have common questions of fact and law with the main action.  Proposed Intervenors' entry into this action will not in any way multiply the proceedings or unduly increase the Court's burden in ruling in this matter.  Accordingly, the Court should grant Proposed Intervenors leave to intervene so they may participate in this action and ensure their interests are sufficiently protected.

## II.  PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Valley Meat operated a slaughterhouse, producing beef, prior to March 2012.  *See* USDA's 2/29/12 letter, attached hereto as Ex. 1.  During the course of its operations, it has been cited by the federal Food Safety and Inspection Service ("FSIS") for violation of the requirements for humane treatment of animals going to slaughter.  *See id.*  For years, Valley Meat also maintained an illegal mountain of dead animal parts, rotting on its property, until it was found in violation of the New Mexico environmental laws, and fined $86,400.00 by the New Mexico Solid Waste Board in 2012.  *See* N.M. Solid Waste Board's 8/2/12 letter, attached hereto as Ex. 2.  Despite these multiple problems with its facility, in early 2012, Valley Meat decided to switch from slaughtering cows, to slaughtering horses, and applied to the United States

Department of Agriculture's ("USDA") FSIS[1] for a grant of inspection so that it could move forward with its horse slaughter operation.  Dkt. 1 (Compl.), ¶¶ 10-14.

Valley Meat's attempt to switch the species it slaughters came fresh on the heels of a pertinent shift, at the federal agency level, in connection with horse slaughter operations like Valley Meat.  In an amendment to the 2006 Agricultural Appropriations Act, on November 10, 2005, Congress withdrew funding for the inspection of horses intended for slaughter, effectively ending horse slaughter for human consumption in the United States.  Dkt. 1, ¶ 8.  FSIS then created a "'fee-for-service' inspection program with respect to ante-mortem horse inspections and transportation-related horse inspections." *Humane Society of the United States v. Johanns*, 520 F. Supp. 2d 8, 13 (D.D.C. 2007).  In that case, HSUS sued USDA, and alleged that formal review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, was required before horse slaughter operations could begin anew, based on the significant environmental impacts of those operations. *Id*. at 19-20.  The court agreed, and permanently enjoined USDA from inspecting new horse slaughter facilities without first undertaking proper NEPA review. *Id*. at 38.

On November 18, 2011, Congress reinstated funding for USDA inspections of horse slaughter facilities.  Dkt. 1, ¶ 8.  Between 2006 and the present date, as far as Proposed Intervenors know, USDA has not engaged in NEPA review of any horse slaughter plants, and certainly not Valley Meat.  The November 2011 appropriations simply meant that, if all other legal hurdles were cleared, USDA had the option, within its discretion, to authorize a grant of inspection for new horse slaughter facilities.

On April 9, 2012, Proposed Intervenors submitted a rulemaking petition to the USDA, identifying a number of legal issues in connection with horse slaughter operations, requesting the

---

[1] For purposes of this motion, USDA and FSIS shall be collectively referred to as "USDA."

agency to carefully examine a number of issues with respect to the production of horse meat from American horses, and asking the agency to adopt rules and regulations governing the sale, transport, and processing of horses and horse meat intended for human consumption. *Available at* http://www.fsis.usda.gov/regulations/Petitions/index.asp. On March 26, 2012, Proposed Intervenors submitted a related rulemaking petition to the Food and Drug Administration ("FDA"). *Available at* http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0299-0003. These petitions detail the pharmacopoeia of potentially harmful drugs given to horses, and the litany of health risks associated with human consumption of horse meat. The petitions also set out the complex legal structure for evaluating what safeguards need to be in place before horse slaughter can be safely undertaken. The petitions explain why current inspection and testing protocols are insufficient to prevent the introduction of "adulterated" horse meat from entering the food supply. *See* 9 C.F.R. §§ 301.2(2)(iii), 318.20 (defining adulterated meat with unsafe food additives or unapproved animal drug residue). The petitions propose that USDA and FDA adopt rules regarding the production of horse meat for human consumption to ensure the safety of the meat. These rules involve the manner and nature of inspections at the slaughterhouse and a potential new set of requirements meant to ensure that humans are not put at risk by consuming horse meat.

The central purpose of these petitions is to prevent adulterated horse meat from entering the nation's food supply and to identify related concerns with respect to horse slaughter. USDA and FDA are carefully considering the extensive petitions. If the agencies agree with the points made in the petitions, the parameters for horse slaughter and inspection of horses going to slaughter would need to be significantly altered. The USDA has indicated to Valley Meat that it needs to ensure its protocols are adequate for horse slaughter before it can grant Valley Meat's (or likely any) inspection request. Dkt. 1, ¶ 13.

Valley Meat, through this lawsuit, seeks to force the agencies to permit Valley Meat to begin slaughtering horses and generating horse meat, despite the serious questions about public health and safety raised by the petitions. Valley Meat filed suit on October 19, 2012, alleging that the USDA and FSIS unreasonably delayed issuing a grant of inspection, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq.* Dkt. 1, ¶ 19. Valley Meat seeks declaratory judgment and injunctive relief, including an order from the Court directing the USDA to immediately issue Valley Meat a grant of inspection.

Proposed Intervenor HSUS was the plaintiff in the *Johanns* case cited above, and was actively involved in campaigning to end horse slaughter for human consumption in America several years ago. Declaration of Keith Dane ("Dane Dec."), ¶¶ 5-6. HSUS was also a significant contributor as *amicus curiae* in two cases in which state laws prohibiting horse slaughter were upheld. *Id.*, ¶ 7; *see Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007); *Cavel Int'l., Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007). HSUS has also been working to prevent the institution of renewed horse slaughter in the United States, placing significant valuable resources into that campaign, and as a copetitioner with FRER on the rulemaking petitions before USDA/FSIS and the FDA. *Id.*, ¶ 8. HSUS actively supports legislation directed at prohibiting horse slaughter and the transport of horses for slaughter. *Id.*, ¶¶ 5, 8. Furthermore, HSUS offers information regarding the inhumane treatment of animals on a wide spectrum of topics, including the process of slaughtering horses for their meat. *Id.*, ¶ 4.

Proposed Intervenor FRER is a Colorado-based nonprofit group dedicated to stopping cruelty and abuse of horses through rescue and education. Declaration of Hilary Wood ("Wood Dec."), ¶¶ 1-2. FRER is actively involved in the rescue, rehabilitation and adoption to good homes of domestic and wild horses found at auctions and horses destined for slaughter; and in educational efforts regarding responsible horse ownership, the cruelty of horse slaughter and

wild horse roundups. *Id*., ¶ 2. FRER has expended large amounts of its organizational resources towards its legal efforts to identify the dangers of horse meat consumption, including its efforts as copetitioner on the two rulemaking petitions and multiple other documents submitted to USDA, FDA, and other government agencies. *Id*., ¶¶ 4-6. FRER has assisted thousands of horses through its rescue and educational programs. *Id*., ¶ 2.

FRER and HSUS now file this Motion to Intervene as of right, or in the alternative permissively, on the grounds that they have a direct and substantial interest in the outcome of the instant action, as explained below.

## III. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 24(a)(2) provides that intervention must be allowed if a proposed intervenor

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Thus, to intervene as a matter of right under rule 24(a)(2), "the movant must show that: (i) the motion is timely; (ii) the movant claims an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) the movant's interest is not adequately represented by existing parties." *S2 Automation LLC v. Micron Tech., Inc.*, CIV 11-0884 JB/WDS, 2012 WL 3656462, at *11 (D.N.M. Aug. 14, 2012) (citing *Elliot Indus., Ltd. P'ship. v. Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005)). This Circuit "has tended to follow a somewhat liberal line in allowing intervention," and has recognized, as justifying intervention, the interests of citizens concerned about environmental and animal-related issues. *Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996) ("*Coal. of Arizona*")

(proposed intervenor who advocated for the protection of a threatened owl species, by filing petitions for the protection of the owl's habitat, had an interest in the litigation).

In the alternative, Federal Rules of Civil Procedure 24(b) provides that a court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of fact or law." *Id.* Thus, to permissively intervene in the case the movant must establish the following conditions:

> (i) the application to intervene is timely; (ii) the applicant's claim or defense and the main action have a question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the adjudication of the original parties' rights.

*S2 Automation LLC*, 2012 WL 3656462, at *13 (citing *Forest Guardians v. U.S. Dep't. of Interior,* 2004 WL 3426413, at *10-11 (D.N.M. Jan. 12, 2004)). FRER and HSUS satisfy the requirements under both subsections of Rule 24.

## IV.  ARGUMENT

### A.  FRER AND HSUS SHOULD BE PERMITTED TO INTERVENE AS OF RIGHT.

#### 1.  This Motion is Timely

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250 (10th Cir. 2001) (quotations omitted).

This action was filed in October 2012 and not served upon the federal defendants until late November.  Dkt. 5 & 6 (Affidavits of Service for Summons).  Defendants' responsive pleading is not due until late January 2013, and no proceedings whatsoever have taken place. Immediately upon learning that Valley Meat had filed this lawsuit, Proposed Intervenors had conversations with their counsel, and began to prepare this Motion to Intervene.  Dane Dec., ¶

10; Wood Dec., ¶ 9. Proposed Intervenors seek to enter this action as Intervenor-defendants, but not to enlarge or multiply the proceedings at all, and are willing to coordinate all activities with the named Defendants to minimize the burden on the Court and work with the current parties to expedite a decision. As such, the motion is certainly timely and there can be no prejudice due to the timing of this motion.

### 2. Proposed Intervenors Have Significant Interests at Stake

A party seeking to intervene "must claim . . . an interest relating to the property or transaction which is the subject of the action." *Utah Assoc. of Cntys*, 255 F.3d at 1251 (citing Fed. R. Civ. P. 24(a)(2)). The interest must be "direct, substantial, and legally protectable." *Forest Guardians*, 2004 WL 3426413, at *5. While the inquiry is "highly fact-specific," the "threshold for finding the requisite legal protectable interest is not high." *S2 Automation LLC*, 2012 WL 3656462, at *11. Proposed Intervenors have *multiple* substantial interests in the transactions that are the subject of this litigation that can only be represented by permitting them to intervene.

#### a. *Proposed Intervenors' Pending Rulemaking Petitions*

Groups that provide public comment have a cognizable interest in related litigation. *See*, *e.g.*, *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1195 (10th Cir. 2010) (*WildEarth 1*) (environmental group that submitted comments regarding proposed agency rulemaking had interest in the litigation and could intervene as of right); *Coal. of Arizona*, 100 F.3d at 841 (finding "direct, substantial, and legally protectable" interest in intervenor who was "a photographer, an amateur biologist, and a naturalist who has been at the forefront of efforts to protect" particular species).

Here, Proposed Intervenors' filings with two agencies directly related to the subject of the litigation place them in a special relationship with the facts and law at issue. Proposed

Intervenors filed their petition for rulemaking with USDA on April 9, 2012, and the related petition with FDA on March 26. Both petitions raise serious issues of law and fact with respect to the reopening of horse slaughter plants in America. USDA (and FDA) is in the process of considering the petition which, if treated favorably, could lead to changes in the procedures for inspection of horses sent to slaughter. New regulations could protect consumers and prevent suffering and disease, which are concerns held by Proposed Intervenors and raised throughout the petitions. As the authors of those petitions, awaiting a decision on those petitions by USDA/FSIS, Proposed Intervenors have a vested interest in seeing the petition process through to completion, prior to a decision on individual applications for horse slaughter.

Certainly the level of interest Proposed Intervenors have is at least equal to, if not greater than, those of the intervenors in the cited cases. Proposed Intervenors meet the "interest related to the transaction" prong of the intervention test on the basis of their rulemaking petitions alone – as well as those additional interests discussed in the next two sections.

**b.** ***HSUS Has an Interest in its Favorable Judgment***

As described in the Section II above, HSUS holds a judgment in its favor in the *Johanns* case, permanently enjoining FSIS from beginning inspections of horse slaughterhouses without performing NEPA review. *Johanns*, 520 F. Supp. 2d 8. The legal interest in protection and enforcement of judgments cannot be questioned, and HSUS holds this independent right, with respect to the specific issue in this case – whether horse slaughter operations at Valley Meat can be commenced immediately, and whether USDA can be enjoined from providing Valley Meat with a grant of inspection absent careful review under NEPA, pursuant to the *Johanns* ruling. *See Coal. of Arizona*, 100 F.3d at 841 841 (proposed intervenor's "persistent record of advocacy" for the protection of a threatened owl species, which included obtaining a court order to compel an agency to designate habitat for the owl, "amount[ed] to a direct and substantial

interest in the listing of the Owl for the purpose of intervention as of right," even though the proposed intervenor had little economic interest in the Owl itself.)

The *Johanns* injunction and the court order in HSUS' favor is one that could easily be impaired, frustrated, or confounded by a decision in this case. A ruling in favor of Valley Meat here would be in direct conflict with the ruling in *Johanns*, frustrate the administrative decision making process, and potentially lead to significant confusion as to which judgment to follow. Because HSUS holds the rights to protect and enforce its prior judgment, it has a direct and substantial interest in this litigation, separate from that mentioned in either the preceding, or the following, section.

      **c.**     ***Proposed Intervenors Have a Legal Interest, Rooted in Their Petitions and Expenditure of Significant Organizational Resources, in the Issues in This Case***

Where proposed intervenors have expended substantial time, effort, and resources, and have a dedicated interest in the subject matter of litigation, they qualify for intervention under Tenth Circuit law. This applies equally to noneconomic and economic interests. *See*, *e.g.*, *Coal. of Arizona*, 100 F.3d at 841 (involvement with owl species and "persistent record of advocacy for its protection [through petition writing and related litigation] amounts to a direct and substantial interest in the listing of the Owl for the purpose of intervention as of right. . ."); *WildEarth 1*, 604 F.3d at 1198 ("With respect to Rule 24(a)(2), we have declared it 'indisputable' that a prospective intervenor's environmental concern is a legally protectable interest." (citing *San Juan Cnty., Utah v. United States*, 503 F.3d, 1199 (10th Cir. 2007)); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-563 (1992) ("[T]he desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing."). Proposed Intervenors' interests, established here, could be fundamentally impacted by the outcome of this litigation.

Both groups were involved in the development and drafting of the petitions for rulemaking, and have expended significant organizational resources that could have been used elsewhere, to address the specific issue in this case – whether horse slaughter can start immediately, or is subject to more detailed review by USDA.  In Proposed Intervenors' rulemaking petitions, they address the propriety of granting inspections of horse slaughterhouses – the central issue in this case – based on the important national concerns of consumer health and safety, environmental contamination from horse slaughter, and the inhumane treatment that is an inherent part of horse slaughter.  *See Rulemaking Petitions, available at http://www.fsis.usda.gov/regulations/Petitions/index.asp* (USDA); *http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0299-0003* (FDA).  And separate from the filing of the petitions, both groups have been staunch advocates against inhumane horse slaughter for human consumption, as well as the environmental damage and consumer health problems that arise from the production of horse meat.  Dane Dec., ¶ 4; Wood Dec., ¶¶ 2, 4.  Further, HSUS has been actively involved in legislative efforts to protect horses from slaughter and the cruel transport of horses for slaughter.  Dane Dec., ¶ 5.  And FRER has filed an additional rulemaking petition addressing wild horses going to slaughter, *available at http://www.frontrangeequinerescue.org/documents/wild.horse.filing.dec2012.pdf*, and has corresponded with USDA and FDA multiple times regarding its horse slaughter advocacy.  Wood Dec., ¶ 7.  Based on this longstanding and still ongoing activity to protect the interests of their respective members, staff, and/or supporters, Proposed Intervenors present firm and cognizable interests for the purposes of intervention.

FRER and HSUS have invested significant efforts and resources to protect the public from the dangers posed by the slaughter of horses.  Proposed Intervenors, and the investments they have made, will be directly, substantially, and negatively impacted if Valley Meat is

successful in its lawsuit and is permitted to begin slaughtering horses for human consumption. FRER and its supporters, and HSUS members, staff, and supporters who have spent time and other resources researching and advocating for protection of horses would be adversely affected if plaintiff prevails without a full consideration of the issues. Dane Dec., ¶ 9; Wood Dec., ¶ 8. Therefore, Proposed Intervenors have an interest in the litigation sufficient to satisfy Rule 24(a)(2). *See WildEarth 1*, 604 F.3d at 1198 (holding that environmental group that had an interest in a proposed National Park Service rulemaking and a related lawsuit could intervene in the litigation as of right); *Utah Ass'n of Counties*, 255 F.3d at 1252 ("[W]e find persuasive those opinions holding that organizations whose purpose is the protection and conservation of wildlife and its habitat have a protectable interest in litigation that threatens those goals."); *Coal. of Arizona*, 100 F.3d at 841 ("[W]e hold that Dr. Silver's involvement with the Owl in the wild and his persistent record of advocacy for its protection [through petition writing and related litigation] amounts to a direct and substantial interest in the listing of the Owl for the purpose of intervention as of right, even though Dr. Silver has little economic interest in the Owl itself."); *Bowers v. Mortgage Elec. Registration Sys.*, CIV.A. 10-4141-JTM, 2011 WL 3349297 (D. Kan. Aug. 3, 2011) ("Successful interventions usually involve property interests in land, funds, *the environment*, or intellectual property." (Emphasis added)).

### 3. Disposition Of This Action As A Practical Matter May Impair Or Impede Proposed Intervenors' Ability To Protect Their Interests

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is *possible* if intervention is denied. This burden is minimal." *WildEarth Guardians v. U.S. Forest Service*, 573 F.3d 992, 995 (10th Cir. 2009) (*WildEarth 2*) (emphasis added) ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."). *See also S2 Automation LLC*, 2012 WL 3656462, at *12 ("[I]ntervention may be

based on an interest that is contingent upon the outcome of the litigation" (quoting *San Juan Cnty.*, 503 F.3d at 1203)).

Here, the test is easily satisfied in multiple ways. First, if plaintiff prevails in this action, the interests recognized by this Circuit and detailed above – including the public safety and environmental interests – would be ignored and dismissed by a judgment for plaintiffs here. Second, a judgment could significantly affect Proposed Intervenors' interests in obtaining well-informed and positive agency responses to the pending Rulemaking Petitions, and could lead to a conflict between the judicial decision here, and the administrative decisions on the petitions. Because of Proposed Intervenors' right to have their petitions reviewed, and their interests in a complete review by the agencies could be directly impacted by a decision in this action, they surpass the proof needed for this element.

It is also obvious that the *Johanns* injunction and the court order in HSUS' favor in that case is one that could easily be impaired, frustrated, or confounded by a decision in this case that is in conflict with *Johanns*. *See* 520 F. Supp. 2d 8. In this action, Valley Meat is trying to force FSIS to begin inspections immediately, without careful review. HSUS' judgment in *Johanns* is in total counterpoint to such a decision, since the *Johanns* case requires NEPA review (which understandably takes some time and cannot be done "immediately") before inspections begin. This case and its potential outcome are therefore directly related to HSUS' right to have its judgment enforced.

Finally, whether horse meat that is not sufficiently screened, and likely adulterated, is permitted to enter the nation's food supply through Valley Meat's slaughter of horses hinges on the outcome of this litigation. And the environmental, public health, and inhumane consequences of horse slaughter, which Proposed Intervenors have a strong interest in preventing, would also be impacted by slaughter beginning anew without careful consideration,

which is what plaintiff wants. It is beyond dispute that plaintiff's lawsuit threatens the interests established by Proposed Intervenors, and that those interests could be significantly and severely impaired, and could even be eliminated. This showing is sufficient to meet the third prong of the test. *See Coal. of Arizona*, 100 F.3d at 844 (proposed intervenor's interest in (1) protecting a threatened owl species, (2) his petitions to protect the owl's habitat, and (3) the court order he obtained for the designation of critical owl habitat could be impaired "as a practical matter" by the "*stare decisis* effect of the district court's decision, not to mention the direct effect of a possible permanent injunction").

### 4. Absence of Adequate Representation

The intervenor must also show "the *possibility* that representation may be inadequate." *WildEarth 1*, 604 F.3d at 1200 (emphasis added). "The possibility that the interests of the applicant and the parties may diverge need not be great in order to satisfy this minimal burden." *Id.* That showing cannot be disputed here, given the status of the parties. First, Proposed Intervenors satisfy this requirement because it is "on its face impossible for a government agency to carry the task of protecting the public's interests and the private interests of a prospective intervenor." *Id.* (internal quotations omitted) (citing *WildEarth 2*, 573 F.3d at 996; *Utah Ass'n of Cntys.*, 255 F.3d at 1255). "Where a government agency may be placed in the position of defending both public and private interests, the burden of showing inadequacy of representation is satisfied." *Id.* (citing *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111, 1117 (10th Cir. 2002)). Because, as a matter of law, the USDA cannot protect the Proposed Intervenors' private interests, the absence of adequate representation requirement is satisfied.

Even without that clear statement of the law, there are other factors at play here that demonstrate the current defendants do not and cannot adequately represent Proposed Intervenors' interests. First, in the *Johanns* case, USDA was the defendant and HSUS was the

plaintiff, on issues directly related to the current action. The current defendants, in that earlier lawsuit, argued that there was no requirement for NEPA review before horse slaughter facilities opened. While HSUS fully expects that the USDA will comply with the judgment in the *Johanns* case, it seems without much argument that a previously adverse party, on the very same issue, cannot now be said to be the right party to represent the former opponent's interests. Additionally, Proposed Intervenors have petitioned USDA to engage in rulemaking directly relevant to horse slaughter and the issues before this Court in this action. While Proposed Intervenors hope that the agency grants their rulemaking requests in full, until such time it cannot be said that the court or parties could believe that the agency would adequately represent Proposed Intervenors' interests here.

Finally, Proposed Intervenors' interests in preventing inhumane horse slaughter for human consumption, in representing the interests of their respective staff, members, and/or supporters, and in proceeding with their work in this area, certainly cannot be adequately represented by the agency tasked with inspecting horses that are sent to slaughter.

**B.  ALTERNATIVELY, THE COURT SHOULD GRANT PROPOSED INTERVENORS LEAVE TO PERMISSIVELY INTERVENE.**

In the alternative, FRER and HSUS seek permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. The Court should grant permissive intervention, in the alternative, because (1) the motion is timely;[2] (2) Proposed Intervenors' interests and other claims present common questions of law and fact with the main action; and (3) their intervention will not prejudice the parties.

---

[2] Proposed Intervenors refer the Court to Section IV.A.1, *supra*, with respect to the timeliness issue.

### 1. Common question of fact or law

As set out above, Proposed Intervenors' claims in connection with the *Johanns* judgment, and the questions raised and rulemaking requested in their petitions, are directly in line with claims and potential defenses in this action. Valley Meat in the instant case is focused on forcing USDA to begin horse slaughter inspections immediately. Both the petitions and the *Johanns* judgment address the requirements for horse slaughter inspections. Thus, the main legal question is effectively raised in all three places: whether USDA can provide a grant of inspection to Valley Meat immediately, or whether other conditions precede the grant. The underlying parallel questions of law include whether horse meat is adulterated pursuant to federal law and whether adequate NEPA review has been undertaken, which are addressed in the work Proposed Intervenors have been doing on this issue.

The similar questions of fact, stated in this action and expressed in Proposed Intervenors' other legal claims, center on the factors that USDA needs to include as it decides what is needed to provide a grant of inspection to an entity like Valley Meat. All of the factors, and the factual and legal basis for them, are presented in the rulemaking petitions and/or the *Johanns* decision or other advocacy in which Proposed Intervenors have been involved. These common questions support intervention under Rule 24(b).

### 2. Absence of Prejudice

There can be no argument with the timely nature of this filing. Nothing has occurred in the case except for the filing of the complaint. *See* Fed. R. Civ. P. 24(b)(3); *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 943 (10th Cir. 2005) (district courts must consider prejudice or delay in deciding whether to grant permissive intervention). Nor will Proposed Intervenors in any way add to the issues or complicate the litigation. Proposed Intervenors are willing to participate in unison with the federal defendants in connection with

any briefing, hearings or motions, and do not intend to file any counterclaims or otherwise expand the issues before this Court. In fact, intervention by Proposed Intervenors will likely streamline the litigation, given Proposed Intervenors intimate familiarity with the issues in this case, both from a factual and legal perspective. Proposed Intervenors are open to reasonable conditions placed upon their participation in this action, so that the action and its resolution are streamlined.

## V.    CONCLUSION

For the above reasons, FRER and HSUS respectfully ask the Court to grant their motion to intervene in this action as a matter of right, or in the alternative, permissively.

Dated:  January 14, 2013                SCHIFF HARDIN LLP


                                        By: *- Electronically Signed by Rocky N. Unruh -*
                                             Rocky N. Unruh (NM Bar #3626)
                                             Bruce A. Wagman (CA Bar #159987)[3]
                                             Attorneys for Proposed Defendant-
                                             Intervenors FRONT RANGE EQUINE
                                             RESCUE and THE HUMANE SOCIETY
                                             OF THE UNITED STATES
                                             One Market, Spear Tower, 32nd Fl.
                                             San Francisco, CA  94105
                                             Telephone:    (415) 901-8700
                                             Facsimile:    (415) 901-8701


### CERTIFICATE OF SERVICE

I certify that I filed the foregoing documents on January 14, 2013 using the ECF System, which will send notification to all parties of record.

*- Electronically Signed by Rocky N. Unruh -*
Rocky N. Unruh

40858-0000
SF\320519001.1

---

[3] Mr. Wagman will file his motion for admission *pro hac vice* upon the Court's granting of the motion to intervene.



# EXHIBIT 1

 United States     Food Safety     Office of Field     Denver District Office
Department of     and Inspection    Operations       Denver Federal Center
Agriculture                                              P.O. Box 25387
                                                      Building 45, Door S-3
                                                      Denver, CO 80225

**SENT CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**& ELECTRONIC MAIL**

February 29, 2012

Mr. Ricardo De Los Santos, General Manager
Valley Meat Co., LLC
Establishment 07299 M
Roswell, NM 88203

**CORRECTED NOTICE OF SUSPENSION**

Dear Mr. De Los Santos:

This letter serves as official written notification of suspension of the assignment of inspectors at your establishment Valley Meat Co., LLC, Establishment 07299 M, located in Roswell, New Mexico, in accordance with 9 CFR 500.3(b)(Rules of Practice). The suspension is based on your failure to meet regulatory requirements in regards to the humane handling of animals at your establishment during slaughter. Dr. ▓(b)(6)(b)(7)(C)▓ Inspector In Charge (IIC) on February 24, 2012, verbally notified you of the suspension.

On February 24, 2012, an FSIS Inspector observed a beef bull being stunned with a .40 caliber pistol, which did not stun the animal. Your backup firearm, a .410 shotgun also failed to stun the animal, after which the plant employee attempted to stun the animal again using the .40 caliber pistol. The backup firearm was again used two more times before the animal was rendered unconscious. Postmortem examination revealed that none of the first four shots penetrated the skull. A Memorandum of interview (MOI), dated February 4th, 2012 clearly describes the situation. The FSIS inspector took regulatory control action, and rejected the knocking area with US Reject Tag # 742705, halting further slaughter operations.

The decision to take enforcement action was based on your failure to meet regulatory requirements in accordance with 9 CFR 313.16 (a) (3), 9 CFR 313.16 (b), and 9 CFR 313.16 (b) (2) in regard to the humane handling of animals at your establishment during slaughter operations. The *Federal Meat Inspection Act* (21 U.S.C. Section 603 (b)) provides the legal authority to suspend operations at any establishment where livestock have not been handled in a humane manner as described in 7 U.S.C. 1901 where it states, "It is therefore declared to be the policy of the United States that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods".

In addition, 21 U.S.C. 610 (b) describes inhumane handling as a prohibited act in slaughter establishments. In accordance with 9 CFR 500.3 (b), the suspension of inspection at an

establishment may be initiated without prior notification for inhumane handling practices and under authority of 21 U.S.C. 621.

Based on these findings, FSIS has concluded that the suspension action at Valley Meat Co., LLC, Establishment 07299 M, is warranted. The suspension will remain in effect until you provide adequate written assurances to the Denver District Office with a detailed description that all animals will be humanely stunned. The corrective and preventive actions should include, at the minimum the following:

Provide written documentation describing the corrective actions and preventive measures that you will implement to prevent any future recurrence of inhumane stunning of animals at Establishment 07299 M, including the actions to be taken to prevent animals from suffering multiple inadequate attempts to properly stun.

You may appeal this action by contacting:
Dr. Armia Tawadrous
Executive Associate for Regulatory Operations
USDA/FSIS/OFO
3157 South Agriculture Building
14th and Independence Avenue, S.W.
Washington, DC 20250
Phone: 202-720-3697
Fax: 202-290-3287

In Accordance with 9 CFR 500.5 (d), you may request a hearing concerning this action by contacting:

Director
Evaluation and Enforcement Division
Office of Program Evaluation, Enforcement, and Review
Food Safety and Inspection Service
United States Department of Agriculture
Patriots Plaza III, 8th Floor, Cubicle 93
355 E Street, SW
Washington, DC 20024-3221
Phone: (202) 418-8872
Fax number: (202) 245-5097

Please submit all written responses to the Denver District Office. If you have any questions regarding this matter, you may contact the Denver District Office at 303-236-9800

Sincerely,

Dr. Scott Wagner
Deputy District Manager
Denver District

cc:     FO/QER
        Reader File
        Est. File
        R. Nelson, DM
        A. Gallegos, DDM
        R. Reeder, DDM
        (b)(6)(b)(7)(C), DDICS
        (b)(6)(b)(7)(C) DVMS
        (b)(6)(b)(7)(C) FLS
        (b)(6)(b)(7)(C) IIC
        (b)(6)(b)(7)(C), RD/OPPER



**EXHIBIT 2**

*Environmental Protection Division*
*Solid Waste Bureau*



SUSANA MARTINEZ
Governor

JOHN A. SANCHEZ
Lieutenant Governor

1190 St. Francis Drive, Room S2050
P.O. Box 5469
Santa Fe, New Mexico 87502-5469
Telephone (505) 827-0197
Fax (505) 827-2902
www.nmenv.state.nm.us

DAVE MARTIN
Secretary

BUTCH TONGATE
Deputy Secretary

**Certified Mail – Return Receipt Requested No. 7011 3500 0000 0328 3210**

August 2, 2012

Ricardo De Los Santos, Agent
Valley Meat Company, LLC
3845 Cedarvale Road
Roswell, New Mexico 88203

Dear Mr. De Los Santos:

Please find the enclosed Administrative Compliance Order ("Order"), No. SWB 12-16 (CO), issued to Valley Meat Company, LLC by the Secretary of the New Mexico Environment Department ("NMED") through his designee, Mary E. Rose, Acting Director, Environmental Protection Division. The Order alleges violations of the Solid Waste Act, NMSA 1978, §§ 74-9-1 to 74-9-42, and the New Mexico Solid Waste Rules, 20.9.2 – 20.9.10 NMAC, for the failure to register a composting facility and for failing to dispose of several thousand cubic yards of previously-composted material disposed upon the ground at Valley Meat Company's Roswell, New Mexico business location. The Order compels compliance and assesses a civil penalty of $86,400.00.

The Order imposes certain requirements upon Valley Meat Company, LLC concerning its answer and defenses, and provides certain rights, including the right to a public hearing. These requirements and rights are stated within the Order. If you have any questions, or if you wish to schedule a pre-hearing settlement conference, please call me at (505) 827-2924.

Sincerely,

George W. Akeley Jr. (Chuck)
Manager, Enforcement Section

Enclosure – Administrative Compliance Order No. SWB 12-16 (CO)

| | | |
|---|---|---|
| NEW MEXICO ENVIRONMENT DEPARTMENT, | ) ) ) | No. SWB 12-16 (CO) |
| Complainant, | ) ) | |
| v. | ) ) | |
| VALLEY MEAT COMPANY, LLC, | ) ) | |
| Respondent. | ) | |

## ADMINISTRATIVE ORDER REQUIRING
## COMPLIANCE AND ASSESSING A CIVIL PENALTY

Pursuant to the New Mexico Solid Waste Act ("SWA"), NMSA 1978, §§ 74-9-1 to 74-9-42, the Secretary of the New Mexico Environment Department ("NMED"), acting through his designee, the Director of the Environmental Protection Division, issues this Administrative Compliance Order ("Order") to Valley Meat Company, LLC ("Respondent"), to assess a civil penalty for violations of the SWA and the New Mexico Solid Waste Rules ("SWR"), 20.9.2 – 20.9.10 NMAC, and to compel compliance with the SWA and the SWR.

## FINDINGS OF FACT

1.  Complainant is an agency of the executive branch of New Mexico state government and is charged with the administration and enforcement of the SWA and the SWR.

2.  Respondent is a for-profit New Mexico corporation with its principal address at 3845 Cedarvale Road, Roswell, New Mexico 88203-9020. Respondent owns and operates a livestock slaughter and processing business ("facility") and is engaged in composting the resulting offal, a special waste as defined by the SWA and SWR. Respondent's organizer and registered agent is Ricardo De Los Santos.

3.  Respondent is a "person," as defined in the SWA, NMSA 1978, § 74-9-3.I, and 20.9.2.7.P(2) NMAC.

4.  Respondent's slaughterhouse, processing and composting operations are located at 3845 Cedarvale Road, Roswell, New Mexico.

5.  Pursuant to 20.9.2.7.C(12) NMAC, "compost" means "organic material that has undergone a controlled process of biological decomposition and pathogen reduction, and has been stabilized to a degree that the final product is potentially beneficial to plant growth and can be used as a soil amendment, growing medium amendment or other similar uses."

6.  Pursuant to 20.9.2.7.C(13) NMAC, "composting" means "the process by which biological decomposition of organic material is carried out under controlled conditions.  The process stabilizes the organic fraction into a material which can be easily and safely stored, handled and used in an environmentally acceptable manner."

7.  Pursuant to 20.9.2.7.C(14) NMAC, "composting facility" means "a facility, other than a transformation facility, that is capable of providing biological stabilization of organic material."

8.  Pursuant to 20.9.2.7.S(13) NMAC, "special waste" means "solid waste that has unique handling, transportation, or disposal requirements to assure protection of the environment and the public health, welfare and safety," and includes packing house and killing plant offal.

9.  Pursuant to 20.9.2.10.A(1) NMAC, no person shall "store, process, or dispose of solid waste except by means approved by the secretary and in accordance with [Environmental Improvement Board] regulations…".

10. Pursuant to 20.9.2.10.A(3) NMAC, no person shall "dispose of any solid waste in a place other than a solid waste facility that meets the requirements of [the SWR]…".

11. Pursuant to 20.9.3.27.A(2) NMAC, the owner or operator of a composting facility that accepts only source separated compostable materials shall file an application for a registration with the NMED at least 30 days prior to any operations and every five years thereafter.

12. Pursuant to 20.9.3.27.A NMAC, "[f]acilities covered by this section [20.9.3.27 NMAC] that do not timely file a complete application for registration are hereby deemed unpermitted solid waste facilities, and the owner or operator may be subject to penalties, permit requirements and nuisance abatement orders."

13. Respondent's facility is a composting facility as defined by the SWR.

14. On April 7, 2010, the NMED telephonically informed Respondent of the requirement to register its composting operation and the requirement to send a company representative for training to become a certified compost facility operator. On the same day, a subsequent electronic mail was sent to Respondent providing internet links to the webpage of the Solid Waste Bureau of the NMED ("SWB") explaining the requirements of the SWR and links to the Composting Facility Registration Form.

### May 13, 2010 Inspection

15. On May 13, 2010, a NMED enforcement officer, accompanied by the Chief of the NMED's Solid Waste Bureau ("SWB"), inspected Respondent's facility to determine compliance with the SWR.

16. During the May 13, 2010 inspection, the NMED enforcement officer observed and recorded, or otherwise verified that Respondent:

A. Failed to register its composting operation, as a Composting Facility Registration Form had not been provided to the NMED. A copy of the necessary registration form was left with Respondent during the inspection. Respondent agreed to submit the registration form to the NMED's SWB within two weeks of the inspection;

B. Failed to properly dispose of solid waste, specifically thousands of cubic yards of aged, previously-composted and stockpiled material consisting of bones, hides, and heads mixed with manure, located along the southeast corner of the property. Additionally, the inspection documented an active offal composting operation at a covered, canopy area located adjacent to the old stockpiled material; and

C.  Failed to properly compost offal, as evidenced by protruding and/or uncovered animal parts (offal) and entire carcasses in the active composting piles located at the covered, canopy storage area.

### *December 10, 2010 Inspection*

17. On December 10, 2010, a NMED enforcement officer performed a follow up inspection of Respondent's facility to determine compliance with the SWR.

18. During the December 10, 2010 inspection, the NMED enforcement officer observed and recorded, or otherwise verified that Respondent:

A.  Failed to register a composting facility, as Respondent failed to submit a registration form, as agreed to by Respondent during the telephonic discussion of April 7, 2010 and during the NMED SWB's May 13, 2010 inspection; and

B.  Failed to properly dispose of solid waste – specifically, the previously composted and stockpiled material, as Respondent had not removed any of this material for proper disposal, as discussed during the NMED SWB's May 13, 2010 inspection.

19. On January 4, 2011, the NMED's SWB issued a Notice of Violation ("NOV") to Respondent, documenting Respondent's failure to register a composing facility, the improper composting of a special waste (offal), and the failure to properly dispose of solid waste (previously composted material).  The NOV requested voluntary compliance and a response to the NMED, in writing, within ten (10) days of receipt.  The response was to include submission of a completed Composting Facility Registration Form and a written abatement plan for the removal and proper disposal of the previously composted material.

20. On January 7, 2011, the NMED's SWB received Respondent's Composting Facility Registration Form.

21. On January 14, 2011, Respondent replied to the NOV, in part, stating that a Composting Facility Registration Form had been submitted and that the improper composting of special waste (offal) had been corrected.  Regarding the previously composted material,

Respondent asserted that it would begin processing the material to remove large items of bone and seek a landfill to which the material could be sent for disposal.

<em>April 18, 2012 Inspection</em>

22. On April 18, 2012, a NMED enforcement officer performed a follow up inspection of Respondent's facility to determine compliance with the SWR.

23. During the April 18, 2012 inspection, the NMED enforcement officer observed and recorded, or otherwise verified that Respondent:

   A.  Failed to register a composting facility, as Respondent's offal composting operations were continuing, and the Compost Facility Registration Form received by the SWB on January 7, 2011 had not been approved and a Certificate of Registration had not been issued; and

   B.  Failed to properly dispose of solid waste – specifically the previously composted and stockpiled material, as Respondent had not removed any of this material for disposal, as required in the NMED SWB's January 4, 2011 NOV. The NMED enforcement officer provided Respondent with a copy of a letter dated January 31, 2012, in which the operator of the Roswell Municipal Landfill agreed to accept Respondent's previously composted and stockpiled material for disposal. The NMED enforcement officer advised Respondent that this waste needed to be disposed within 30 days.

<em>April 26, 2012 Inspection</em>

24. On April 26, 2012, a NMED enforcement officer conducted a follow-up inspection of Respondent's facility to determine compliance with the SWR.

25. During the April 26, 2012 inspection, the NMED enforcement officer observed and recorded, or otherwise verified that Respondent:

   A.  Failed to register a composting facility, as Respondent's offal composting operations were continuing, and the Compost Facility Registration Form received by the SWB on January 7, 2011 had not been approved and a Certificate of Registration had not been issued; and

5

B. Failed to properly dispose of solid waste – specifically the previously composted and stockpiled material, as Respondent had not removed any of this material for disposal, as discussed during the NMED SWB's inspection of April 18, 2012.

26. On April 28, 2012, Respondent began transportation and disposal of the first truckloads of the previously composted and stockpiled material at the Roswell Municipal Landfill. Landfill records available to the NMED indicate that five loads were transported to the landfill on that day, totaling 95.69 tons of waste. Additional loads were transported to the landfill on April 30, 2012 and May 12, 15, 17, 18, 24-26 and 30, 2012. However, upon information and belief, as of the issuance date of this Order, approximately 50% of the previously composted and stockpiled material remains at Respondent's facility and transportation of additional loads of the waste to the landfill have ceased.

27. On June 7, 2012, the NMED denied Respondent's composting facility registration application. Denial of the application was based on insufficient responses to the NMED's requests for additional information relating to Respondent's operations plan, the failure to complete the registration in a timely manner, and Respondent's lack of a consistent effort to assure timely removal of the stockpiles and to find alternatives for disposal of the offal waste generated from the slaughterhouse operation.

## CONCLUSIONS OF LAW

28. Paragraphs one (1) through 27 are incorporated herein by reference.

### Violation No. 1

### Failure to Register a Composting Facility

29. In violation of the SWR, 20.9.3.27.A(2) NMAC, Respondent failed to register its offal composting operation, one instance of violation, occurring on or before October 11, 2010 to on or after December 9, 2010 (a period of 60 days).

Violation No. 2

Failure to Properly Dispose of Solid Waste

30. In violation of the SWA, NMSA 1978, § 74-9-31.A(1)(a), and the SWR, 20.9.2.10.A(1) and (3) NMAC, Respondent failed to properly dispose of several thousand cubic yards of solid waste comprised of previously-composted and stockpiled material that was abandoned upon the ground at Respondent's business property, one instance of violation, occurring on or before February 18, 2012 to on or after April 17, 2012 (a period of 60 days).

## CIVIL PENALTY

31. Section 74-9-36.B of the SWA authorizes the assessment of civil penalties of up to Five Thousand Dollars ($5,000) per day for each violation of the SWA or the SWR. The NMED hereby assesses a civil penalty of Eighty-Six Thousand and Four Hundred Dollars ($86,400) for Respondent's two (2) violations. The penalty is calculated based on the factors set forth in the NMED's Solid Waste Civil Penalty Assessment Policy and upon such other factors as justice may require. The individual penalty for each violation is:

| Violation | | Amount |
|---|---|---|
| No. 1 | Failure to Register a Composting Facility | $48,000 |
| No. 2 | Failure to Properly Dispose of Solid Waste | $38,400 |

32. Payment shall be made by certified or cashier's check payable to the State of New Mexico and mailed or hand delivered to George W. Akeley Jr. (Chuck), Manager, Enforcement Section, Solid Waste Bureau, NMED, Harold Runnels Building, Room S-2062, 1190 St. Francis Drive, P.O. Box 5469, Santa Fe, New Mexico 87502-5469.

## SCHEDULE OF COMPLIANCE

33. Based on the foregoing findings and conclusions, and pursuant to the SWA, NMSA 1978, § 74-9-36.A(1), Respondent is hereby ordered to comply with the following schedule of compliance:

A. Upon Receipt of this Order, Respondent shall cease offal composting operations;

B.  No later than fifteen (15) days after the receipt of this Order, Respondent shall contact the NMED to discuss the requirements of this Order;

C.  Within thirty (30) days of receipt of this Order, Respondent shall submit to the NMED an abatement plan addressing cleanup and removal of the remaining previously composted and stockpiled material, and the proposed disposition for any on-site offal that is being stored or actively composted at the Facility at the time this Order was issued; and

D.  Within forty-five (45) days of receipt of this Order, Respondent shall pay the penalty.

## NOTICE

34. For failure to take corrective action and timely comply with the foregoing requirements of this Order, the Secretary of the NMED, pursuant to the SWA, NMSA 1978, § 74-9-36.C, may seek to assess additional civil penalties of not more than Ten Thousand Dollars ($10,000) for each day of non-compliance with the Order.

## NOTICE OF OPPORTUNITY TO ANSWER AND REQUEST A HEARING

35. Under the SWA, § 74-9-36.G, this Order shall become final unless, no later than thirty (30) days after the Order is served, Respondent submits a written request to the Secretary for a public hearing to:  Sally Worthington, Hearing Clerk, Office of the Secretary, NMED, Harold Runnels Building, Room N-2150, 1190 St. Francis Drive, P.O. Box 5469, Santa Fe, New Mexico 87502-5469.  A copy of this Order must be attached to the Request for Hearing.

36. Pursuant to 20.1.5.200.A(2) NMAC governing the NMED's Adjudicatory Procedures, Respondent's Request for Hearing shall include an Answer.

37. Pursuant to 20.1.5.200.A(2)(a) NMAC, Respondent's Answer shall clearly and directly admit, deny or explain each of the factual allegations contained in the Order with regard to which Respondent has any knowledge.  Where Respondent has no knowledge of a particular factual allegation, Respondent should so state, and Respondent may deny the allegation on that basis.  Any allegation of the Order not specifically denied shall be deemed admitted.

38. Pursuant to 20.1.5.200.A(2)(b) NMAC, Respondent's Answer shall also include any affirmative defenses upon which Respondent intends to rely. Any affirmative defenses not asserted in the Answer and Request for Hearing, except a defense asserting lack of subject matter jurisdiction, shall be deemed waived.

39. Pursuant to 20.1.5.200.A(2)(c) NMAC, the Answer shall be signed under oath or affirmation that the information contained therein is to the best of the signer's knowledge true and correct.

40. The public hearing shall be governed by the NMED's Adjudicatory Procedures, 20.1.5 NMAC.

## FINALITY OF ORDER

41. This Order shall become final unless Respondent files a Request for Hearing and Answer within thirty (30) days after receipt of this Order. Unless a hearing is requested and an Answer filed in writing, the penalty proposed in this Order shall become due and payable as set forth in the Schedule of Compliance.

## SETTLEMENT CONFERENCE

42. Whether or not Respondent submits a Request for Hearing and files an Answer, Respondent may confer with the NMED concerning settlement. The NMED encourages settlement consistent with the provisions and objectives of the SWA and the SWR. Settlement discussions do not extend the thirty (30) day deadline for filing an Answer and Request for Hearing, or alter the deadlines for this Order. Settlement discussions may be pursued as an alternative to and simultaneously with the hearing proceedings. Respondent may appear at the settlement conference *pro se* (without legal counsel) or may be represented by legal counsel.

43. Any settlement reached by the parties must be consistent with the SWA and the SWR. Any settlement must be approved by the Secretary of the NMED and shall be a Stipulated Final Order signed by the parties. The Stipulated Final Order must contain all of the requirements of 20.1.5.600 NMAC.

44. To explore the possibility of settlement in this matter, you may contact R. Cook Flynn, General Counsel, Office of General Counsel, New Mexico Environment Department, P.O. Box 5469, Santa Fe, New Mexico 87502-5469, (505) 827-2855.

45. Compliance with the requirements of this Order does not relieve Respondent of the obligation to comply with all other applicable laws and regulations.

## **TERMINATION**

46. This Order shall terminate when Respondent certifies that all the requirements of this Order have been met, and the NMED has approved such certification, or when the Secretary approves a Stipulated Final Order.


_Butch Longate_                                   _8/2/12_
Mary E. Rose, Director (Acting)                   Date
Environmental Protection Division
New Mexico Environment Department

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Administrative Compliance Order was mailed via certified mail, return receipt requested, No. 7011 3500 0000 0328 3210, postage prepaid on this 2nd day of August, 2012, to the following person:

Ricardo De Los Santos, Agent
Valley Meat Company, LLC
3845 Cedarvale Road
Roswell, New Mexico 88203


Sara Martinez, Administrative Secretary
Solid Waste Bureau